CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 06 2012

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROY CROCKETT,<br>    Plaintiff, | Civil Action No. 7:11cv00550 |
| v. | **MEMORANDUM OPINION** |
| D.A. BRAXTON *et al.*,<br>    Defendants. | By: Samuel G. Wilson<br>United States District Judge |

This is an action pursuant to 42 U.S.C. § 1983 by plaintiff Roy Crockett, a Virginia inmate proceeding *pro se*, alleging that the defendants violated the Eighth Amendment to the United States Constitution by failing to provide him with adequate medical care for his "kidney problems." Crockett seeks a declaratory judgment, injunctive relief, and damages to redress his alleged injuries. The defendants, four medical professionals and the warden of Keen Mountain Correctional Center ("KMCC"),[1] have moved for summary judgment, and Crockett has filed responses in opposition to those motions, making this matter ripe for disposition. Because the uncontradicted evidence shows that the defendants were not deliberately indifferent to a serious medical need, the court grants the defendants' motions for summary judgment.

---

[1] Crockett names Dr. Gerald T. Hopkins, John D'Alessandro, Eugene Whited, Daniel Braxton, and John Doe Health Services Director as defendants to this action. Dr. Hopkins is a licensed physician within the Commonwealth of Virginia. Hopkins Aff. ¶ 1. D'Alessandro is a physician's assistant licensed by the Commonwealth of Virginia. D'Alessandro Aff. ¶ 1. Dr. Hopkins and D'Alessandro provide medical services to inmates at Keen Mountain Correctional Center ("KMCC"). Hopkins Aff. ¶ 1; D'Alessandro Aff. ¶ 1. Under Dr. Hopkins' supervision, D'Alessandro is able to conduct physical examinations, diagnose and treat illnesses, order and interpret tests, counsel on preventative health care, give medical orders, and write prescriptions. D'Alessandro Aff. ¶ 1. Dr. Hopkins is not required to be physically present when D'Alessandro delivers medical services to inmates. Id. Whited is a registered nurse licensed in the Commonwealth of Virginia. Whited Aff. ¶1. Whited is the Health Administrator at KMCC and supervises the medical department. Id. Nurse Whited's duties include reviewing informal complaints from inmates concerning medical issues. Id. Daniel Braxton is the Warden at KMCC. Braxton Aff. ¶ 1. Braxton has no responsibility or supervision over the actual administration of medical services provided by the medical department staff. Id. at ¶ 4.

## I.

On February 18, 2011, Crockett was transferred from Lawrenceville Correctional Center ("LCC") to KMCC. Upon Crockett's arrival at KMCC, he received a full medical examination. Crockett alleges that medical staff at KMCC also received his medical records from his prior facility which "clearly indicated that [Crockett] was on chronic care status for hypertension."[2] (Crockett concedes that since arriving at KMCC, medical staff has continued to provide his hypertension medications.) According to the medical transfer paperwork,[3] there is no indication that Crockett was suffering any kidney problems at the time of his transfer. See Medical Records at p. 10. As KMCC staff processed Crockett into his new facility, medical personnel completed an intake form. Similar to the other paperwork, it provides no indication that Crockett was suffering any kidney problems. See Medical Records at p. 9.

On February 28, 2011, lab work was performed on Crockett. See Medical Records at pp. 33–35. Crockett's lab results indicated that his creatinine level was 1.49 and his estimated glomerular filtration rate ("eGFR") was 54. (Kidney function is evaluated by measuring creatinine and eGFR levels. The normal creatinine range for a male is 0.76–1.27; the normal eGFR for an African American male is 59 or higher.) There is no evidence that any of the defendants were aware of these results before July 2011.

Crockett claims that in June 2011, he began experiencing severe headaches, night sweats, and "extreme kidney pain." On June 24 and 25, 2011, Crockett states that he signed up for sick call to see the doctors "about his condition." Crockett alleges that his sick-call request was

---

[2] At LCC, Crockett received regular medication to treat chronic hypertension. There is no indication that Crockett received any treatment for "kidney problems" while at LCC. The court notes that none of the named defendants to this action conducted Crockett's intake medical examination.

[3] Crockett's medical records are annexed to the defendants' motion for summary judgment (Docket No. 24) at exhibit 4. All references to medical records herein refer to those records annexed to the motion for summary judgment.

returned to him a few days later with a notation that he had been called to medical but refused to go. Crockett does not deny this. That same day, Crockett filed an informal complaint requesting medical treatment for his "headaches, chest pains, and pain in [his] kidneys." Crockett claims that on June 28, 2011, his pain became "so intense" that he filed an emergency grievance seeking medical treatment. A nurse evaluated Crockett the same day and scheduled him to see physician's assistant D'Alessandro.

On July 6, 2011, D'Alessandro examined Crockett. Crockett alleges that after he told D'Alessandro of his kidney pain, D'Alessandro reviewed Crockett's medical file and commented that it reflected a history of kidney problems, referring to the February 28, 2011, lab work. Crockett claims that this was the first he had heard of any kidney problems. D'Alessandro ordered further blood and urine tests, which were performed on July 8, 2011. Crockett claims that despite his complaints of pain, D'Alessandro did not prescribe any pain medication. The new lab results indicated that Crockett's kidney readings were improving—his creatinine level was 1.41 and his eGFR was 64. On July 13, 2011, D'Alessandro reviewed Crockett's lab work, noted Crockett's improving kidney function, and ordered a repeat of the lab work in three months. On July 14, 2011, Crockett filed an informal complaint stating that he was in "constant pain" and not receiving adequate medical treatment. The response to this complaint indicated that the doctors were aware of Crockett's lab work and that his condition was being monitored.

On August 1, 2011, Crockett filed an informal complaint arguing that he had not received any medical treatment "whatsoever," that his kidneys were still "hurting," and that it was "unreasonable not to do further tests to [determine] the cause of [his] pain and suffering." In response to the complaint, Crockett was advised that lab work had been completed and reviewed

by the doctor, that repeat lab work was scheduled, and that he should request sick call if he was still concerned.

On September 1, 2011, Crockett claims that his kidneys were in "excruciating" pain and he requested sick call. In response, a nurse examined Crockett and told him that he would be placed on the list to see a doctor. Medical staff offered Crockett over-the-counter pain medication, which he refused. Later that same day, Crockett filed an emergency grievance seeking medical treatment. In response to his grievance, the evening nurse placed Crockett on Tylenol twice a day for five days. The nurse also advised Crockett to return to medical if his pain became worse.

On September 7, 2011, Crockett saw D'Alessandro. Crockett states that D'Alessandro performed no physical examination of Crockett but asked him what was wrong. Crockett claims that he told D'Alessandro that he was in extreme pain. D'Alessandro prescribed Tylenol for an additional thirty days and ordered additional, very specific urine tests to look for something inside the kidney that could be causing his high (but improving) kidney readings. D'Alessandro Aff. ¶ 7. After his appointment with Crockett, D'Alessandro called Dr. Hopkins to discuss Crockett's medical needs. Id. D'Alessandro asked Dr. Hopkins whether he should order a renal ultrasound and Dr. Hopkins told him not to do the ultrasound until the urine and kidney function test results were returned. Id. Dr. Hopkins also advised D'Alessandro that the types of pain medication available to Crockett were limited, because nonsteroidal anti-inflammatory drugs are contraindicated in patients with kidney function issues. Id. at ¶ 8; Hopkins Aff. ¶ 8. On September 20, 2011, Crockett stayed overnight in the medical department in order for staff to collect his urine for twenty-four hours.

On October 6, 2011, Crockett filed an informal complaint, claiming that the pain medication was not working and that he was in constant pain. Crockett's kidney function tests were repeated on October 14, 2011, and they showed that Crockett's kidney function was well within normal limits (his creatinine was 1.26 and his eGFR was 85). On October 19, 2011, Crockett was scheduled to see D'Alessandro, but claims he was prevented from doing so by correctional officers in his housing unit. After Crockett missed his appointment, he filed an emergency grievance and an informal complaint. In response to his informal grievance, Nurse Whited informed Crockett that he would be rescheduled to see D'Alessandro. On October 26, 2011, D'Alessandro ordered additional lab work to be performed on Crockett in two months. On December 29, 2011, that lab work was performed and the results reflected that Crockett's kidney function was within normal limits and still improving (his creatinine was 1.16 and his eGFR was 94). D'Alessandro then ordered follow-up lab work to be done in three months. Now Crockett claims that the defendants have failed to provide him with adequate medical treatment, in violation of the Eighth Amendment to the United States Constitution.

## II.

Crockett alleges that the defendants were deliberately indifferent to his "kidney problems." However, the uncontradicted record of treatment shows otherwise, and the court grants the defendants' motions for summary judgment.[4]

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that jail officials were deliberately indifferent to a

---

[4] Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the burden of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing a summary judgment motion under Rule 56, the court "must draw all justifiable inferences in favor of the nonmoving party." United States v. Carolina Transformer Co., 978 F.2d 832, 835 (4th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

serious medical need. Estelle v. Gamble, 429 U.S. 97, 105 (1976); Staples v. Va. Dep't of Corr., 904 F.Supp. 487, 492 (E.D. Va. 1995). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A prison official is "deliberately indifferent" only if he "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference. Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); see also Farmer, 511 U.S. at 837. The officer's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Militier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Harris v. Murray, 761 F. Supp. 409, 414 (E.D. Va. 1990). Unsuccessful medical treatment does not give rise to a § 1983 cause of action. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Further, the Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996); Lewis v. Lappin, Nos. 3:10cv130, 3:10cv568, and 3:10cv684, 2011 U.S. Dist. LEXIS 120177, at *8 (E.D. Va. 2011); Smith v. FCM-MTC Med., LLC, No. 3:10cv352, 2011 U.S. Dist. LEXIS 28899, at *30 (E.D. Va. 2011); Bowman v. Johnson, No. 3:08cv449, 2010 U.S. Dist. LEXIS 100932, at *21 (E.D. Va. 2010). Treatment below the standard of care shows negligence, but

negligence is not sufficient to establish a claim of deliberate indifference. See Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002); Williams v. O'Leary, 55 F.3d 320, 324 (7th Cir. 1995).

Here, the uncontradicted evidence shows that the defendants did not display deliberate indifference to a serious medical need. There is no evidence to suggest that any of the defendants were aware of Crockett's kidney-related issues when Crockett was initially transferred to KMCC. Shortly after his transfer to the KMCC, lab work was performed on Crockett. Those lab results came back on March 1, 2011, and showed that Crockett had abnormal kidney readings. After becoming aware of Crockett's lab results on July 6, 2011,[5] D'Alessandro recommended further testing and monitoring of Crockett's kidney function, and D'Alessandro ordered additional urine and blood tests. Those tests, performed on July 8, 2011, indicated that Crockett's kidney readings were improving. After receiving those results, D'Alessandro's recommended course of treatment was further testing and monitoring of Crockett's kidney function. On September 1, 2011, D'Alessandro examined Crockett. After the examination, D'Alessandro ordered very specific urine tests in an attempt to find the source of Crockett's complaints. At the same time, D'Alessandro also called Dr. Hopkins to discuss Crockett's case and whether or not a renal ultrasound should be ordered. Dr. Hopkins recommended that no renal ultrasound be performed until the results from the urine tests and repeat kidney function lab work came back. Crockett's urine testing was completed over the course of twenty-four hours, beginning on September 21, 2011. Kidney function lab work was performed on October 14, 2011, and the results indicated that Crockett's kidney function was within normal limits and continuing to improve. Upon reviewing these results, D'Alessandro

---

[5] D'Alessandro has stated under oath, and Crockett has not demonstrated otherwise, that D'Alessandro was not aware of Crockett's lab results until Crockett's July 6, 2011, appointment, during which Crockett complained to D'Alessandro for the first time that he was experiencing kidney pain.

again recommended continued testing and monitoring of Crockett's kidney function. Additional lab work was performed on Crockett on December 29, 2011, and the results again indicated that Crockett's kidney function was continuing to improve.

The undisputed evidence does not demonstrate deliberate indifference to Crockett's medical needs. Rather, it shows a continuing course of treatment and steadily improving lab results—hardly so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Militier, 896 F.2d at 851. While it is fairly clear that Crockett disagrees with the medical staff's diagnosis and recommended course of treatment, such disagreements do not implicate the Eighth Amendment.[6] Wright, 766 F.2d at 849; Harris, 761 F. Supp. at 414.

### III.

For the reasons stated, the court grants the defendants' motions for summary judgment.

**ENTER:** September 6, 2012.

UNITED STATES DISTRICT JUDGE

---

[6] To the extent Crockett intends to assert that the defendants violated his constitutional rights by shuffling his grievances from office to office with no permanent resolution to them, his claim fails. It is well settled that a prisoner has no right to participate in the grievance procedure. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Accordingly, any shuffling of Crockett's grievances, whether intentional or not, was not a constitutional violation.

To the extent Crockett seeks to recover for the pain he allegedly suffered beginning in late June, 2011, the court finds that Crockett has not demonstrated that the defendants acted with deliberate indifference. The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." Snipes, 95 F.3d at 592; Lewis, 2011 U.S. Dist. LEXIS 120177, at *8; Smith, 2011 U.S. Dist. LEXIS 28899, at *30; Bowman, 2010 U.S. Dist. LEXIS 100932, at *21. At most, Crockett's allegations concerning the defendants' failure to provide him with pain medication during this time amount to a claim of negligence, which is not actionable under the Eighth Amendment. And to the extent Crockett complains that the Tylenol prescribed after September 1, 2011, was insufficient to handle his pain, the court finds that this allegation amounts to nothing more than a doctor-patient disagreement over a recommended course of treatment, which is also not actionable under the Eighth Amendment.

8